**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **THOMAS STEEL STRIP CORPORATION,** ) ) ) | **CASE NO. 4:06 CV 0658** |
| **PLAINTIFF** ) ) | |
| v. ) ) | **JUDGE PETER C. ECONOMUS** |
| **AMERICAN INTERNATIONAL SPECIALITY LINES INSURANCE CO.,** ) ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| **DEFENDANT** ) | |

This matter is before the Court upon the Plaintiff, Thomas Steel Strip Corporation's, Motion for Partial Summary Judgment Pursuant to Fed.R.Civ.P. 56.  (Dkt. # 27).

**I.   FACTUAL BACKGROUND**

This is an environmental insurance coverage case initiated by Plaintiff Thomas Steel Strip Corporation ("Thomas") against Defendant American International Speciality Lines Insurance Company ("American Insurance").  Thomas processes specialty steel strips at its plant in Warren, Ohio.  (Dkt. #28). American Insurance is a corporation based in New York that is in the business of providing commercial environmental insurance.  (Dkt. #1). American Insurance insured Thomas under a policy  that was in effect from December 8,

2003 through December 8, 2006 (the "Policy").  The instant dispute concerns the availability of coverage under a portion of the Policy which provides for on-site cleanup of pre-existing environmental pollution.  The following facts are undisputed.

### A. Regulation of the Thomas sites

As a result of its steel plating and wastewater treatment operations, Thomas generates a type of waste that is classified by the United States Environmental Protection Agency ("USEPA") as "hazardous."  40 C.F.R. § 261.31(a).  Facilities such as Thomas that generate hazardous waste must eventually cease the treatment, storage and disposal of the hazardous waste.[1]  Under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*. ("RCRA"), when a facility ceases receiving, treating, storing, or disposing of hazardous waste, it must "close" the hazardous waste management unit in which hazardous waste was stored.  40 C.F.R. § 265.112(b).  Because there are hazardous waste units on the Warren facility property, Thomas was required under the RCRA and corresponding federal regulations to "have a written closure plan."  40 C.F.R. § 265.112(a).  A "closure plan" is a description of the "steps necessary to perform partial and/or final closure of the facility at

---

[1] Under RCRA, a "facility" is "all contiguous property under the control of the owner or operator seeking a permit under subtitle C of RCRA." 40 C.F.R. § 260.10. A "hazardous waste management unit" is a "contiguous area of land on or in which hazardous waste is placed, or the largest area in which there is significant likelihood of mixing hazardous waste constituents in the same area." Id.  Both parties acknowledge that Thomas is a "facility" under the RCRA.

any point during its active life." 40 C.F.R. § 265.112(a).[2]

Under Ohio law, the owner or operator of the facility must submit its closure plan to the USEPA's Regional Administrator for approval, and that authority will "approve, modify or disapprove the plan." 40 C.F.R. § 265.112(a). The closure plan is then furnished to the Director of the Ohio Environmental Protection Agency ("OEPA"). Ohio Admin. Code § 3745-66-12(D)(4). If the Director does not approve the plan, "he will provide the owner or operator with a detailed written statement of reasons for the refusal and the owner or operator must modify the plan or submit a new plan. . . ." Id.

On July 11, 1984, the USEPA and the OEPA conducted an inspection at Thomas's Warren facility. The inspection revealed that Thomas was not in compliance with certain RCRA requirements. As a result, the USEPA filed a complaint against Thomas (The "USEPA Complaint") in December 1984, ordering Thomas to develop closure plans for the hazardous waste units on its property. (Dkt. #30, Ex. A). Thomas and the USEPA subsequently entered into a Consent Agreement and Final Order (the "Consent Agreement") in June 1986, which required that Thomas provide closure plans for the Warren facility, including procedures, timetables and cost estimates. It also stated that, "upon approval of the closure plan by USEPA and OEPA, Respondent will immediately implement closure

---

[2] Closure plans must include, "a detailed description of the steps needed to remove or decontaminate all hazardous waste residues and contaminated ... soils during partial and final closure including . . . procedures for cleaning equipment and removing contaminated soils, methods of sampling and testing surrounding soils, and criteria for determining the extent of decontamination necessary to satisfy the closure performance standards.

activities related to the surface impoundments in accordance with the approved schedule in the plan." (Dkt. #30, Ex. B).

Pursuant to the Consent Agreement, Thomas submitted a closure plan in early 1986, which stated an "expected date of closure" of August 1, 1987. (Dkt. #30, Ex. C). In July and September of 1988, the USEPA notified Thomas that its Closure Plans were disapproved. The USEPA provided Thomas with a timetable for implementing approved closure plans. (Dkt. #30, Ex. E and F). Thomas, however, was unable to comply with the closure plan provided by the USEPA in 1988. Instead, Thomas had a series of discussions with the USEPA regarding its RCRA regulated closure activities. The USEPA granted Thomas numerous extensions of time to submit amended Closure Plans in conformity with RCRA regulations. (Dkt. #30, Ex. H, I, J, K, L, M, O, P, Q). In a letter dated February 9, 2005, Thomas submitted amended closure plans reflecting OEPA comments to the closure plans previously submitted. (Dkt. #0, Ex. S). Finally, on April 27, 2005, OEPA sent a letter to Thomas approving the amended closure plans submitted in February 2005. (Dkt. #30, Ex. T).

### B.  American Insurance's Policy Terms

American Insurance issued Thomas a "claims-made and reported" policy, which covered the risk of a claim being made between December 8, 2003 to December 8, 2006.[3]

---

[3] The Supreme Court has explained that "an 'occurrence' policy protects the policy holder from liability for any act done while the policy is in effect, whereas a 'claims made' policy protects the holder only against claims made during the life of the policy." St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 535 (1977).

"Coverage A" of the Policy entitles Thomas to coverage for "ON-SITE CLEAN-UP OF PRE-EXISTING CONDITIONS." (Dkt.#30, Ex. X). Coverage A of the Policy provides, in relevant part, as follows:

> To pay on behalf of the Insured (Thomas), Loss that the Insured is legally obligated to pay as a result of Claims initiated by a governmental entity for Clean-Up Costs resulting from Pollution Conditions on or under the Insured Property that commenced prior to the Continuity Date (which was December 8, 1997), provided such Claims are first made against the Insured and reported to (American Insurance) in writing during the Policy Period.

(Dkt. #30, Ex. X). "Claim" is defined in the Policy as follows:

> Claim means a written demand received by the Insured seeking a remedy or alleging liability or responsibility on the part of the Insured for Loss under Coverage A ...

(Dkt. #30, Ex. X).

By letter dated June 13, 2005, Thomas advised American Insurance that it sought insurance coverage associated with the closure plans for its Warren facility:

> For a number of years, Thomas has been in discussions with the Ohio EPA regarding RCRA regulated closure activities at the Delaware Avenue facilities. These discussions and the RCRA exposures were noted in Thomas's application for coverage sent to American Insurance International Companies, and dated November 14, 2003. A great deal of time, testing, analysis and legal advocacy went into
> creating an acceptable (and cost effective) solution to the RCRA exposures at this facility.

That letter also stated that, "in addition to future costs estimated in the approved Plan,

Thomas has incurred $303,739 for legal fees and environment [sic] engineering services. The money has been spent to mitigate the liability, negotiating with the Ohio EPA, and to create the most cost effective resolution." (Dkt. #30, Ex. U). American Insurance rejected Thomas's demand for insurance coverage associated with clean-up of the Warren Facility, asserting that the "claim" was not first made by a governmental entity against Thomas during the policy period because the original USEPA Complaint occurred in 1984. (Dkt. #30, Ex. A).

## II.  PROCEDURAL HISTORY

Thomas filed its Complaint against American Insurance on March 22, 2006, alleging that the American Insurance pollution liability policy required American Insurance to provide coverage for the clean-up of hazardous waste units on Thomas property. (Dkt. #1). Specifically, Thomas claims that American Insurance breached its insurance contract by refusing to provide insurance coverage, and that the breach was in "bad faith." Thomas also seeks declaratory judgment asserting that American Insurance is obligated to indemnify Thomas for a claim brought against Thomas by the OEPA for environmental clean-up and response. Jurisdiction as to all claims is based on diversity of citizenship, 28 U.S.C. 1332.

Plaintiff filed this Motion for Partial Summary Judgment on October 2, 2006, asking the Court to determine whether its claim under Coverage A of the American Insurance Policy was first made and reported within the policy period. (Dkt. #26). The Court notes that the only claim at issue is the instant lawsuit is Plaintiff's claim under Coverage A. (Complaint, Dkt. #1).

-6-

### III.  STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ P. 56(c).  The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party."  Little v. BP Exploration & Oil Co., 265 F.3d 357, 361 (6th Cir. 2001).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.  "A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56 (c)).  For a dispute to be genuine, the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

**IV. LAW AND ANALYSIS**

**A. Insurance Contracts Under Ohio Law**

In Ohio, insurance contracts are construed as any other written contract.[4] See Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd., 64 Ohio St. 3d 657, 665, 597 N.E.2d 1096 (1992). An insurance policy will only require interpretation if the applicable language is ambiguous – that is, open to more than one interpretation. "Policies of insurance, which are in language selected by the insurer and which are reasonably open to different interpretations, will be construed most favorably for the insured." Butche v. Ohio Casualty Ins. Co., 174 Ohio St. 144, 187 N.E.2d 20, paragraph three of the syllabus (1962). Whether an insurance policy is unambiguous or requires interpretation is a question of law. "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." Inland Refuse Transfer Co. v. Browning-Ferris Industries, Inc., 15 Ohio St. 3d 321, 322, 474 N.E.2d 271 (1984). In interpreting the insurance contract, common words evince their ordinary meaning unless manifest absurdity results or some other meaning is clearly intended by the instrument. See Alexander v. Buckeye Pipeline Co., 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph two of the syllabus (1978).

**B. Thomas's Claim That It Must Be Under a Legal Obligation to Pay a "Loss" in Order for a Claim to Arise Under the Policy**

---

[4]

In diversity actions, a federal court applies the forum state's choice-of-law provisions. See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); Spence v. Miles Laboratories, Inc., 37 F.3d 1185, 1188 (6th Cir. 1994). The parties concur that Ohio law governs this action as evidenced by their utilization of the laws of the state of Ohio, and the authorities interpreting Ohio law, when addressing the instant motion. Accordingly, the Court shall apply Ohio law to claims at issue.

-8-

Thomas contends that its claim for insurance coverage arose during the policy period because Thomas was not legally obligated to clean-up the Warren facility until the closure plans were approved in April 2005. The Policy states that American Insurance must pay, on behalf of Thomas, "loss that the Insured is *legally obligated* to pay as a result of Claims initiated by a governmental entity." (emphasis added) (Dkt. #30, Ex. X). Thomas cites Alan Corp. v. International Surplus Lines Insurance Co., 22 F.3d 339 (1st Cir. 1994) for the proposition that it was not legally obligated to pay the clean-up costs until the OEPA approved the closure plans in April 2005. The insured in Alan purchased a claims-made policy, which provided insurance for clean-up costs incurred by the insured "in the discharge of a legal obligation validly imposed through government action." Id. at 340. The insured became aware of potential contamination and reported it to the local fire department, and the fire department directed the insured to contact the appropriate regulatory agency regarding the contamination.

The First Circuit held that the insured's phone call to the fire department did not impose any obligation upon the insured because no information was conveyed and the fire department merely informed the insured that it had a duty to report any contamination to the appropriate agency. Alan, 22. F.3d at 341. The court found that a legal action was not imposed on the insured until the regulatory agency issued a "notice of responsibility" for pollution clean-up because the insured's duty to clean-up the contamination stemmed from compliance with the regulatory agency's directives. Id.

Thomas asserts that, similar to the phone call to the fire department in Alan, its

-9-

discussions with the OEPA in the 1980's regarding clean-up of the Warren facility did not impose a legal obligation on Thomas. Specifically, Thomas characterizes its initial discussions with the OPEA as "the first of many steps" that lead to the clean-up mandate. (Dkt. #26). Unlike the insured in Alan, however, Thomas had already been notified of its duty to clean-up contamination by the appropriate regulatory agency. (Dkt. #30, Ex. A, B). If the Court adopted Thomas's interpretation of the Policy, it would encourage the insured to delay clean-up activities until the insured obtained an insurance policy. The fact that Thomas was initially unable to comply with its obligations under Ohio law does not change the fact that it was under a legal obligation to do so. Accordingly, the Court rejects Thomas's argument that it was not legally obligated to clean-up the Warren Facility until April 2005.[5]

### C. Thomas's Argument that the 1984 Proposed Closure Plans and the April 2005 Closure Plan Are Different "Claims"

Thomas next argues that the "claim" could not have arisen in the 1980's because the "prior plans were not the same as the approved 2005 plan." (Dkt. #16). Thomas, however, cites no authority standing for the proposition that a new claim is triggered each time closure plans are modified. As American Insurance points out, the record demonstrates that each

---

[5]

Thomas also cites Dilmar Oil Co. v. Federated Mutual Insurance Co., 986 F. Supp.2d. 959 (D.S.C. 1997) for the proposition that Thomas was not legally obligated to pay the clean-up costs until the closure plans were approved in April 2005. At issue in Dilmar was whether the insured's cause of action arose within the statute of limitations, which is not at issue in the case at bar. Therefore, the Dilmar court's discussion of when the insured suffered an "actual" injury is not relevant to the determination of when the cause of action accrued, not to the interpretation of the policy language.

closure plan prepared and proposed by Thomas relates to the same demand initiated by the OEPA in 1984. Thomas itself acknowledged that its responsibility to clean-up the Warren facility stems from the initial demand received in 1984. For example, Thomas sent the OEPA a letter in 2001, stating that,

> Pursuant to OAC § 3745-66-13(B) Thomas requests an extension of the closure period for four inactive hazardous waste management units locates, Thomas requests and at its manufacturing facility in Warren, Ohio... The original closure plan for these four units was approved by the OEPA in 1988, but the parties have modified the closure approach in the plan and agreed to resulting changes several times since that initial approval.

(Dkt. #30, Ex. H).

Although the 2005 approved closure plans may impose different costs or methods of implementation, they are still related to the initial demand for closure. Therefore, Thomas's argument that the April 2005 approval constituted a new claim must fail.

### D. Thomas's Claim That the Clean-up Costs Are Covered Because the Policy Covers Pre-Existing Pollution Conditions

Thomas finally argues that its "claim" for insurance coverage did not arise in the 1980's because "the 'claims-made' language in the Policy is for risk reduction after the policy expires." (Dkt. #36). Thomas cites Central Illinois Public Service Co. v. American Insurance Insurance Empire Surplus Lines Ins. Co., 642 N.E2d 723, 726 (Ill.App.Ct. 1994), in which the court noted that "the major difference between a claims made and an occurrence policy lies in the risk insured. In an occurrence policy, the risk is the occurrence itself, whereas in the claims made policy the risk insured is the claim brought by a third party."

-11-

Central Illinois Public Service Co., 642 N.E2d at 726. Thomas fails to clarify how Central Illinois Public Service Co. supports its assertion that the Policy covers clean-up costs for pollution at the Warren facility.

The Court's construction of Thomas's argument reveals two flaws. First, the court in Central Illinois Public Service Co. found that the insurer was not liable for environmental costs because the Illinois Environmental Protection Agency did not make a claim against the insured during the policy period. Central Illinois Public Service Co., 642 N.E2d at 727. Therefore, the opinion lends support to American Insurance's position that it is not liable for clean-up costs that Thomas incurred outside the policy period.

Second, Thomas fails to distinguish between a pre-existing "condition" and a pre-existing "claim." As American Insurance points out in its Memorandum in Opposition, the Policy's coverage of pre-existing pollution conditions does not mean that the Policy covers pre-existing claims made outside the policy period. (Dkt. #30). The language of the Policy suggests that while pre-existing conditions are covered, claims are only covered if they are "first made against the Insured and reported... in writing during the policy period." (Dkt. #30, Ex. X). Therefore, the Court finds from the clear and unambiguous language of that the Policy does not cover claims against Thomas that are made outside policy period.

## V. CONCLUSION

The Court finds that Thomas's claim for clean-up of the Warren facility is not covered by the Policy. The Policy requires that a claim initiated by a governmental entity for clean-up costs resulting from pollution conditions be "first made against the insured and

reported to American Insurance during the Policy Period." (Dkt. # 30, Ex. X). Because the claim was initiated by a governmental entity against Thomas in 1984, the claim was not first made against Thomas during the Policy Period. The Court further finds that the only claims alleged by Thomas arose from Coverage A of the Policy, which is at issue in the instant motion. Because the Court has found that Thomas's claim for clean-up is not covered by Coverage A of the Policy, there are no remaining claims at issue in the instant action.

Accordingly, the Plaintiff, Thomas's Motion for Partial Summary Judgment, is **DENIED.**

The Court orders that a status hearing shall be held on **January 24, 2007 at 10:30 a.m.** Counsel shall appear in person**.**


**IT IS SO ORDERED.**

> **/ s / Peter C. Economus  - January 11, 2006**
> **PETER C. ECONOMUS**
> **UNITED STATES DISTRICT JUDGE**